INTERNATIONAL TRUST COMPANY *vs.* JOSEPH S. WILSON.

Suffolk.    November 16, 1893. — March 13, 1894.

Present: FIELD, C. J., ALLEN, HOLMES, MORTON, & BARKER, JJ.

*Verdict ordered by Judge — Authority of Partner — Fraud — Notice.*

Where a jury have returned findings upon questions submitted, but have separated without agreeing on a verdict, the presiding justice may nevertheless order a verdict if upon the findings and the whole evidence either party has a clear right in law to a verdict.

If by a private agreement the authority of one partner to borrow money for a firm is limited to loans on notes payable to and indorsed by the other partner, and a bank has discounted such notes for the firm, the form of the notes is material but not conclusive evidence upon the question whether the bank should be charged with notice of the limitation of authority in a suit brought by it on a subsequent note made payable to the bank and secured by collaterals.

If the president of a bank has noticed indications in the bank account of a firm that the firm was not prosperous, and had seen one member of the firm, who carried on its business in Boston, the worse for liquor, and knew that the other member of the firm resided in another city and paid but little attention to the business of the firm, these are suspicious circumstances, but consistent with good faith in taking a note of the firm for value before maturity, and are not enough to justify charging the bank with notice of any infirmity or taint in the transaction.

CONTRACT, on three promissory notes, and for money had and received.    The first two notes, dated April 3 and April 30, 1891, were for $750 and $500 respectively, drawn by Wilson, Cassells, and Company to the order of the defendant, and by him indorsed. The third note, dated July 16, 1891, was for $500, drawn in the same manner as the first two, payable to the plaintiff, and secured

by collaterals.   The items of the count for money had and received corresponded in dates and amounts with the three notes above described.

At the trial in the Superior Court, before *Richardson*, J., there was evidence tending to show that in June, 1887, the defendant with Wilfred E. Cassells and W. J. Hareson formed a limited partnership under the firm name of Wilson, Cassells, and Company, to continue for three years; that, except for the withdrawal of Hareson, this partnership continued throughout its term, and that at its close, though there was no renewal of the partnership articles, the partnership between the defendant and Cassells was not formally dissolved, but continued, for the purpose of closing up some contracts which they had on hand, until about August 1, 1891, when it was brought to an end by the death of Cassells.

John M. Graham, a witness for the plaintiff, testified that he was president of the plaintiff corporation; that at one time he had lived in Fitchburg, and knew the defendant, who also resided there, and knew that his financial standing was good; that from the time the partnership was formed until after the death of Cassells he had never spoken with the defendant; that all he knew of the partnership he learned from Cassells, with whom he had all the transactions hereinafter stated; that about July 31, 1889, Cassells came to the plaintiff corporation and opened an account in the name of Wilson, Cassells, and Company; that the first deposit was the proceeds of a note for $500, signed by Wilson, Cassells, and Company, payable to the order of the defendant, and bearing his indorsement; that the witness, prior to discounting the note, had looked up the defendant's credit in some mercantile agencies, and found it satisfactory; that from time to time thereafter he continued, at the request of Cassells, to discount notes, made in the same form, signed by Wilson, Cassells, and Company, payable to the order of the defendant, and bearing what purported to be his indorsement; that during this time he discounted twenty-six or more notes made in precisely the same form; that he discounted no notes signed by Wilson, Cassells, and Company made in any other form than the first one discounted, except upon two occasions, to wit, June 27 and July 16, 1891; that on the first occasion the note was a collateral note in form like the third

one in suit, signed by Wilson, Cassells, and Company for $250 on ten days, having as collateral thereto the notes of customers of the firm to the extent of about $500, and on the second occasion the note was the third note in suit, which had as collateral customers' notes to the amount of $1975. On cross-examination the witness testified that he knew that the defendant took no part in the active management of the business ; that he was engaged in business in Fitchburg and came to Boston infrequently ; that the firm checks were all drawn by Cassells, and that it would be possible for him, immediately upon the entering of the proceeds to the credit of the firm, to draw them out upon checks in the firm name, and to apply them to his private and personal uses, in fraud of his partner.

It further appeared, that during the last months before Cassells's death nearly all the checks that had been drawn were " cash " checks, so called, payable to the order of no particular person, and the funds were for the most part drawn out on such checks by Cassells personally, or by the bookkeeper for him. On cross-examination, Graham further testified that at any time he could have looked over the checks drawn by the firm, and if he had seen that most of them were " cash " checks it would have been significant to him, but he did not remember having looked them over, though there were things about the account that attracted his attention, regarding which he frequently spoke to Cassells.

A transcript of the deposit pass-book of the firm of Wilson, Cassells, and Company was introduced in evidence, from which it appeared that during the months of May, June, and July, 1891, seventeen deposits were credited to the firm, of which only eight were deposits of funds of the firm in the regular course of business, and these were generally of small amounts, while all the others were discounts of notes like those in suit, none of which, the defendant testified, were indorsed, authorized, or known of by him.

Graham further testified on cross-examination that the account of the firm had been called to his attention, and that he had had several interviews with Cassells about it, and had noticed unusual facts regarding it which indicated to his mind that the firm was not doing a flourishing business and the account was not a desir-

able one, and that he had so notified Cassells; that he had seen Cassells on different occasions the worse for liquor, and that he had thought of writing to Wilson about Cassells, and that if he had written he would have called Wilson's attention to the bank account; that he knew that Wilson was in business in Fitchburg and was paying little attention to the business here, and was practically at the mercy of Cassells if he was disposed to defraud him; that he had told Cassells on different occasions several months before his death that he could not discount for him to the extent that he had been doing, and that the line of discount must be reduced; and that he did this on account of the things he had noticed, and which had attracted his attention to the account. He testified that the first two notes in suit were not an unusual form of business paper, that this form of note was frequently used in order that the note might be " two name " paper, and that the holder might thus be able to hold the firm property and that of the partner indorsing it, but that he did not at any time request the notes to be made in that form, and that he did not rely at all upon the name of J. S. Wilson as an indorser, but relied wholly upon the fact that he was a general partner of the firm of Wilson, Cassells, and Company, to which firm he was making the loan; that if a partner desired to borrow money for himself individually for the purpose of lending or advancing it to the firm of which he was a member, a form of note like the first in suit would be the usual and proper form to use, and that it indicated that the loan. applied for was made to the individual partner, and by him advanced to the firm, and that he should have so construed it if an agent or clerk of the partner indorsing the paper, or any other person than the partner not indorsing, presented the paper for discount, but that it was an equally usual and ordinary form of note for one partner to have discounted for the benefit and use of the firm, the two names being used in such cases to make the note a stronger one.

The defendant testified that he lived in Fitchburg, and that in 1887 he formed the partnership with Cassells and Hareson for the purpose of carrying on the business of dealing in safes; that he never gave the business any personal supervision, but came to Boston once a month on an average, and at such times usually called at the store; that the only book he looked at was the note-

book, or book showing the notes issued or discounted by the firm; that none of the notes in suit appeared on the note-book, and that several of the notes testified to by Graham did not appear on the note-book, while all the notes that he indorsed for the partnership did so appear; that he never knew of or authorized any loans to the partnership except those made upon notes appearing in the note-book signed by Cassells in the partnership name payable to his order; that, beginning with August 1, 1889, he had indorsed fifteen notes payable to his own order, signed by Wilson, Cassells, and Company; that there was an agreement between him and Cassells that no money should be borrowed for the firm except upon notes in this form bearing his indorsement; that he gave the notes he indorsed to Cassells and authorized him to raise money on them, and to put it into the firm; that the last note on which he was such indorser matured on May 2, 1891, and was for $500, and was paid by him; that at no one time was he on such paper to the amount of more than $1800; that he never indorsed or knew in any way of the notes in suit until they were called to his attention in the latter part of July, 1891, when he came to Boston and saw on the desk in the place of business of Wilson, Cassells, and Company notices of three notes that were presently to come due at the banking-house of the plaintiff; that he went immediately to the banking-house and asked the secretary, Jewett, how Wilson, Cassells, and Company stood with that company; that Jewett replied there was a small balance of a few dollars due them, and in reply to his request for an explanation of the notices of these notes said that the company had $3,500 in notes signed by Wilson, Cassells, and Company, all of them, except the note third in suit, payable to the order of Joseph S. Wilson, and purporting to be indorsed by the defendant; that the notes were shown to him by Jewett; that he immediately declared the indorsements forgeries, and started to take measures to secure the arrest of Cassells, when he learned that he had shot himself in Portland, Maine; that on the same day or the next day he called on Graham regarding the notes, and during the conversation Graham told him that he had thought for some time that Cassells was going wrong, and that he (Graham) had started to write to the defendant about it, but, supposing that Cassells was a nephew or some relative of the defendant, had neglected to do so.

The defendant requested the judge to rule: 1. Upon all the evidence in the case, the plaintiff cannot recover under any count in its declaration.   2. One partner has no power or right, from being a partner, to sign the individual name of another partner; and if Cassells, without express authority from the defendant, indorsed the name of J. S. Wilson upon the back of the notes in suit, he was thereby guilty of forgery, and his action did not bind the defendant in any respect.   3. The form of the notes used in all transactions with the plaintiff was notice to the plaintiff that Cassells had no authority to borrow money in behalf of the partnership, except upon paper made payable to the order of the defendant, and bearing his valid and genuine indorsement thereon. 4. The form of the notes in suit, as well as of those previously used in all transactions with the plaintiff, was notice to the plaintiff that the loans made were not loans to the partnership, but to Wilson individually, and that Cassells was assuming to act in the matter as Wilson's agent, and not in the exercise of his general authority as a partner; and, the plaintiff having had this notice, the burden is upon it to prove by a fair preponderance of the evidence that Cassells actually had authority from the defendant to act as his agent in securing the loans, and such authority is not to be implied from the fact that he was a partner of the defendant, but must be shown independently of that fact.   5. To enable an indorsee to recover on a count for money had and received of the maker of a note he must show a complete legal title by indorsement, and unless he can do so the presumption does not arise that the party liable on the notes holds a sum of money to the use of the party entitled to it, on which the law raises an implied promise to support the action.   6. The form of the notes in suit gave notice to the plaintiff that the notes were the individual property of the defendant, and did not belong to the partnership, and that Cassells was dealing with them as agent for the defendant in his individual affairs, and not as agent of the partnership.   There being no evidence of agency on the part of Cassells to secure the loan to the defendant individually, the plaintiff cannot recover.   7. If the indorsement J. S. Wilson appearing upon the back of two notes in suit was not written by the defendant or some person expressly authorized by him so to do, the plaintiff cannot recover upon the two notes, or either of

them.   8. The general rule of law is, that one partner may bind his copartners to pay money lent to the partnership by a person dealing in good faith, but if the person making the loan has notice or reasonable ground to apprehend that the partner with whom he is dealing is abusing the confidence of or defrauding the others, the other partners are not bound to repay the loan, although it was made to the partnership and the proceeds went to its benefit.   9. There being evidence that Graham had reasonable cause to believe that Cassells was abusing the confidence of his partner, it is material whether the partnership had the benefit of the proceeds of the note.

The judge declined to rule as requested in the first six requests, and instructed the jury that "I am not able to rule that the notes themselves show that this money which Cassells obtained on the discount of these notes was for Wilson individually. I do not mean to say there may not possibly be some evidence of it, — I mean I cannot rule that the form of the notes themselves indicates that."

As to the seventh request for rulings, the judge instructed the jury that it seems to be admitted that upon the first two notes the plaintiff cannot recover, for the reason that they were made to the order of J. S. Wilson, and if he did not indorse them then they were not completed notes, and the plaintiff cannot recover on them as indorsee ; and it seems to be admitted that he did not indorse them, and that his signatures on them were not genuine.   But if the plaintiff corporation parted with its money believing that they were genuine indorsements when they were not, it did so upon a mistake of fact, and it could recover the money back from the parties to whom it gave the money, or if it gave the money to a firm, then from the surviving members of that firm ; because money paid out upon a mistake of fact, while not in one sense a fraud, is a legal deception.   If the plaintiff was deceived, it can recover the money back.   This applies to the first two notes.

The other note is made directly by Wilson, Cassells, and Company to the plaintiff corporation, and it is claimed that with it there were collaterals, and that these circumstances were notice to the plaintiff corporation or its president that Cassells was violating his agreement with his firm, or that something was wrong,

and so the plaintiff was put upon its guard. There is nothing in the form of this note in itself that conveys such notice. Whether the fact that this collateral was handed in to the plaintiff corporation at the same time with the note has any significance in showing to the bank officers that a fraud was intended, or that his authority was limited, is a question of fact. If there was anything in the circumstance by which they knew that Cassells was doing wrong in this transaction, and defrauding his partner, or that the president or any other officer of the corporation knew that he was getting this money to spend in fraud of his partner, the plaintiff ought not to recover.

The judge gave the eighth ruling as requested, and as to the ninth request for rulings instructed the jury: " I cannot state that exactly, because it assumes that there is evidence of that particular fact. I should say, if there is evidence that Graham had reasonable cause to believe that Cassells was abusing the confidence of his partner, then perhaps it is material whether the partnership had the benefit of the proceeds of the notes. If the plaintiff parted with its money, without notice or knowledge or having reason to know that it was being obtained by Cassells for his own private use and benefit, and in fraud of the firm, the plaintiff can recover. If, on the other hand, the plaintiff knew that Cassells's purpose was to cheat and defraud his partner, and that the money was not to be used for the firm's benefit, if the plaintiff knew that he had no right to borrow money, if it knew or had reason to know of the limit of his authority which was contained in the private copartnership agreement among the partners, and still let Cassells have the money, and although it went to the firm's credit, if that was a mere form and drawn out by Cassells immediately and used for his own special purposes, and the plaintiff knew or had reason to know of all that, then it cannot recover."

At the request of the plaintiff, the judge instructed the jury that this paper, having been made by a member of the firm and the firm name being signed to it, which was the only way that the paper of that firm could properly be signed, if the defendant undertakes to avoid liability upon the ground that Cassells acted fraudulently, and that the plaintiff knew it or had reason to know it, the burden is upon the defendant to prove that fact, as

the form of the notes does not indicate that they were either drawn for the special benefit and purpose of Wilson, or that their form disclosed any fraudulent purpose or intent.

The judge submitted two questions to the jury to find specially, as follows :

" 1. Was Cassells acting as the agent of Mr. Wilson in getting these notes discounted, and did the plaintiff know or have reason to know that Cassells was then in that matter acting as the agent of Wilson, and not as a member of, or for the firm of, Wilson, Cassells, & Co.

" 2. Did the plaintiff corporation know or have notice of the limitation of Cassells's authority in the copartnership agreement between him and Mr. Wilson in obtaining loans for the firm."

The jury retired near noon, on Friday, and were dismissed by order of the court at midnight of the same day. On the Monday following, at the coming in of the court, the jury returned in a sealed envelope negative answers to both the questions submitted, and reported a failure to agree as to the general verdict.

The judge, at the request of the plaintiff, before the jury were discharged, directed them to return a verdict for the plaintiff for the amount of the third note in suit, and of the first and second items of the count for money had and received. The defendant alleged exceptions.

*S. L. Whipple*, for the defendant.

*R. M. Morse*, for the plaintiff.

BARKER, J.    1. The defendant does not now contend that a presiding justice has no power to order a verdict if the jury have returned their findings upon questions submitted to them, but have separated without arriving at a verdict.   Such a course is warranted by the doctrine that, although a jury have separated, they may be ordered to correct an incomplete and defective finding when the circumstances are such as to make it certain that justice is done by the order.   *Mason* v. *Massa*, 122 Mass. 477, and cases cited.   *Spencer* v. *Williams*, 160 Mass. 17.   When the law applied to the findings made by the jury, and to the evidence applicable to the remaining issues, gives to one party or the other, as matter of law, a clear right to a verdict, the jury

may properly be directed to render that verdict. In such a case it is certain that justice must be done by the order, and that the rights of the parties to have disputed facts found by the jury, and the law of the trial revised by the court of last resort, are not curtailed. As held in *Roberts* v. *Rockbottom Co.* 7 Met. 46, 49, the presiding justice " had authority, at any time before verdict affirmed and recorded, to vary his instruction to the jury, in matter of law, and the jury were in duty bound to be governed by it."

2. If, as the defendant contends, the court had declined to permit the jury to consider the form of the notes upon the question whether the plaintiff should be charged with notice that there was an agreement between Cassells and the defendant limiting Cassells's authority to borrow money for the firm to loans on notes payable to and indorsed by the defendant, such a ruling would have been wrong. As we construe the bill of exceptions the jury were permitted to consider the form of the notes, in connection with all the evidence, but were in effect also instructed that the form of the notes was not, as matter of law, conclusive upon the question. The defendant requested the court to instruct the jury that the form of the notes " was notice to the plaintiff," and that it " gave notice to the plaintiff." This would have been in substance a ruling that the form of the notes was, as matter of law, conclusive in favor of the defendant upon the question, and would have been contrary to the authorities. The true rule was that the jury might consider the form of the notes in connection with all the other evidence in determining the question whether they should in fact charge the plaintiff with notice of a limitation of the authority of Cassells to borrow money for his firm. *Atlas National Bank* v. *Savery*, 127 Mass. 75, 77. *Freeman's National Bank* v. *Savery*, 127 Mass. 75. *Thompson* v. *Hale*, 6 Pick. 258. *Wait* v. *Thayer*, 118 Mass. 473, 478. In *National Bank of the Commonwealth* v. *Law*, 127 Mass. 72, the defendants' indorsement being above that of the payee's made it apparent in the light of St. 1874, c. 404, that their liability was conditional and secondary, and therefore, *prima facie* at least, for the accommodation of the maker. In that case the inference was made necessary by the effect of the statute ; but the decision has no bearing in support of the defendant's contention that the

inference of notice of a limitation upon the authority of one partner to borrow money for the use of his firm should have been held a necessary inference from the form of the note in the case at bar. It is obvious that the same form might have been used if Cassells's authority had been unlimited. The case of *Cutting* v. *Daigneau*, 151 Mass. 297, cited upon this point by the defendant, has no bearing upon it. The note was one given to a partner by his firm, which became insolvent and was dissolved; and the note when long past due was indorsed to the plaintiff merely that the action might not be defeated by the formal objection that the payee, being one of the promisors, could not bring an action against himself, and the action failed because, the firm having failed and its creditors not having been paid, there was no surplus to divide among its members, and the plaintiff stood no better than the original payee.

In our opinion the ruling given did not withdraw the form of the notes from the consideration of the jury. The notes were in evidence, and the instruction could not have been understood to withdraw them from the jury, but merely to declare that they did not show or indicate notice conclusively or as matter of law.

3. The only remaining contention argued by the defendant is, that the court finally withdrew from the jury the question whether the plaintiff should be charged with actual or constructive notice of Cassells's fraud. The jury had found that in fact the plaintiff had no knowledge or notice of the limitation of Cassells's authority, nor that he was then acting as an agent of the defendant, and not as a member of the firm. The remaining evidence applicable to the question was not sufficient to warrant a finding that the plaintiff did not take the notes and advance the money to the firm in good faith. There was no dispute that the plaintiff took the notes before maturity and for value. The evidence that Graham, its president, had noticed unusual facts about the bank account, indicating that the firm was not doing a flourishing business, that he had seen Cassells the worse for liquor and had thought of writing to the defendant about him, that he had notified Cassells on account of these things that he would not discount for him to the extent he had been doing, and that he knew that the defendant was in business at Fitchburg

paying little attention to the business in Boston, and so practically at the mercy of Cassells if he was disposed to defraud him, were merely suspicious circumstances, consistent with the plaintiff's good faith, and not sufficient to justify charging it with notice of any infirmity or taint in the transaction. There was no evidence of such recklessness as would be inconsistent with honesty of purpose or good faith. *Smith* v. *Livingston*, 111 Mass. 342. *Freeman's National Bank* v. *Savery*, 127 Mass. 75, 79. *Lee* v. *Whitney*, 149 Mass. 447.          *Exceptions overruled.*